FILED by LW D.C.

APR 2 8 2011

STEVEN M. LARIMORE
CLERK U. S. DIST. CT
S. D. of FLA. – MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. ___11-20131-CR-Martinez(s)___

18 U.S.C. § 371
18 U.S.C. § 1343
18 U.S.C. § 1341
15 U.S.C. § 77e(a)
18 U.S.C. § 1512(c)(2)
18 U.S.C. § 2
18 U.S.C. § 1956(h)
18 U.S.C. § 981
18 U.S.C. § 982

UNITED STATES OF AMERICA

vs

JONATHAN RANDALL CURSHEN,
MICHAEL SIMON KROME,
RONNY SALAZAR MORALES,
    a/k/a "Ronny Salazar"
ROBERT LLOYD WEIDENBAUM,
ERIC ARIAV WEINBAUM,
IZHACK ZIGDON,
    a/k/a "Ytzhak Zigdon,"
TIMOTHY BROWN BARHAM, JR.,
NATHAN BRADLEY MONTGOMERY, and
RYAN MARK REYNOLDS,

          Defendants.

_____/

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Superseding Indictment:

1.     The United States Securities and Exchange Commission ("SEC") was an independent agency of the United States charged with enforcing the federal securities laws, which are designed to provide the investing public with full disclosure of all material facts regarding matters involving the offer, purchase, and sale of securities, among other things.  These laws protect the investing public in the purchase of stock that is publicly distributed by maintaining fair and honest securities markets and eliminating manipulative practices that tend to distort the fair and just price of stock. The SEC regulated, among other things, the offers and sales of securities.  In order for a company to offer or sell its securities to the public, federal securities laws, specifically section 5 of the Securities Act of 1933, required that the company first file a registration statement with the SEC or that the transaction be exempt from registration.  The requirement of a registration statement was designed, in part, to protect the general investing public by requiring detailed disclosures about a company's actual operations and financial condition.

2.     The National Association of Securities Dealers ("NASD") was an industry organization representing persons and companies involved in the securities industry in the United States. It was a self-regulatory organization ("SRO") responsible for the regulation of its industry, with oversight from the SEC.  NASD licensed individuals and admitted firms to the industry, wrote rules to govern their behavior, examined them for regulatory compliance, and was sanctioned by the SEC to discipline registered representatives and member firms that failed to comply with the federal securities laws and NASD's rules and regulations.

3.      The Over-the-Counter ("OTC") securities market was the equity market for securities not listed on a United States stock exchange or the NASDAQ Stock Market. The OTC market was linked by computer networks, and quotations for OTC securities may have been quoted on listing services such as Pink Sheets.

4.      The Pink Sheets was an inter-dealer electronic quotation and trading system in the OTC securities market.

5.      A pump-and-dump scheme involves the artificial manipulation of the price and trading volume of a particular stock in order to sell that stock at an artificially inflated price. As part of the pump-and-dump scheme, an individual or group of individuals obtains control over a substantial portion of the free trading shares of a company. Free trading shares are shares of stock that the owner can trade without restriction on a national exchange, e.g., the New York Stock Exchange, or are traded in an over-the-counter market, e.g., the Pink Sheets.

6.      The "pump" involves artificially inflating a company's stock price by engaging in coordinated trading of the stock to create the appearance of a more active market for that stock – usually by controlling both the buying and selling activity of the stock. The pump also involved disseminating false and misleading promotional materials – press releases purportedly from the company or advertisements touting the prospects of a company's stock, to encourage innocent investors to purchase the stock.

7.      After pumping up the stock price in the manner described above, the stock is "dumped," meaning large quantities of the shares owned and controlled are sold to unsuspecting investors. The dump usually occurs soon after the dissemination of the promotional materials touting the particular company. A pump-and-dump scheme also involves "parking" shares by

3

depositing or transferring them into different accounts, including accounts in the names of nominees, to conceal the manipulative trading of the stock. Nominee bank accounts are also often used to conceal the dissipation of the proceeds of the fraud.

8.      A "nominee" is someone who owns an asset merely on paper, in order to disguise the true owner of the property. Nominee owners are also used in connection with the formation of shell companies. Bank and brokerage accounts opened in the name of a shell company with a nominee owner are often referred to as "nominee accounts."

9.      A "shell company" or "shell corporation" is a company with no significant assets or business operation.

10.     A "beneficial owner" is the true owner of a nominee account or shell company.

11.     "Restricted" securities are securities acquired in an unregistered, private sale from an issuer or from an affiliate of the issuer. They typically bear a "restricted legend" clearly stating that the shares may not be resold in the public marketplace unless the sale is exempt from the SEC's registration requirements.

12.     "Coordinated Trades" are securities transactions, i.e., buying and selling a security, to create the appearance of increased volume and volatility in a stock. Generally, the individual(s) behind "Coordinated Trading" will simultaneously buy and sell shares in one company through two different brokerage firms in order to create the appearance of substantial trading activity that will draw in other unsuspecting investors.

13.     Rule 144 of the Securities Act of 1933, 17 C.F.R. § 230.144 *et seq.* (2005) ("Rule 144") permitted, under certain circumstances, without registration, the public sale of limited amounts of securities by persons who had acquired restricted securities of the issuer. Among its other

4

requirements, Rule 144 mandated a one-year holding period from the date that the restricted securities were bought and fully paid for.

14.     Section 4(1) of the Securities Act of 1933 ("Section 4(1)") permitted, under certain circumstances, an exemption from registration requirements for transactions by persons other than an issuer, underwriter or dealer.  Transactions by control persons and underwriters intended to distribute securities to the public were not exempt from registration under Section 4(1).

### Defendants

15.     The defendant, **JONATHAN RANDALL CURSHEN**, was a dual citizen of the United States and United Kingdom who resided in Florida and Costa Rica.  **CURSHEN** was the principal of Red Sea Management Ltd. and Sentry Global Securities Limited.

16.     The defendant, **RONNY SALAZAR MORALES, a/k/a Ronny Salazar**, was a dual citizen of the United States and Costa Rica who resided in Costa Rica.  **SALAZAR** was a stock trader at Sentry Global Securities Limited.

17.     The defendant, **ERIC ARIAV WEINBAUM** was a dual citizen of the United States and Israel who resided in Boca Raton, Florida, in the Southern District of Florida.  **WEINBAUM** was an attorney who acted as a stock promoter and stock trader.

18.     Defendant **IZHACK ZIGDON, a/k/a Ytzchak Zigdon**, was a citizen of Israel who resided in Israel and acted as a stock promoter.

19.     Defendant **ROBERT LLOYD WEIDENBAUM** was a citizen of the United States and stock promoter who resided in Key Biscayne and Miami, Florida, in the Southern District of Florida, and was the principal of CLX and Associates, Inc., in Miami, Florida.

20.     Defendant **MICHAEL SIMON KROME** was a citizen of the United Sates who resided in New York, and was licensed as an attorney in New York. **KROME** represented CO2 Tech Ltd., and worked with **WEINBAUM, ZIGDON**, and others on the creation of CO2 Tech Ltd. and the issuance of its free trading shares.

21.     Defendant **TIMOTHY BROWN BARHAM, JR., ("BARHAM")** was a citizen of the United States and stock promoter who resided in Tennessee.

22.     Defendant **NATHAN BRADLEY MONTGOMERY ("MONTGOMERY")** was a citizen of the United States and stock promoter who resided in Nevada.

23.     Defendant **RYAN MARK REYNOLDS ("REYNOLDS")** was a citizen of the United States and stock promoter who resided in Texas.

### Relevant Individuals

24.     Joseph Marshall Francis, Jr. was a citizen of the United States who resided in Tennessee and Costa Rica. Francis was a nominee on bank and brokerage accounts established by Red Sea Management Ltd. and Sentry Global Securities Limited. Francis also was a stock trader for Sentry Global Securities Limited.

25.     Coconspirator 1 was a citizen of Israel who resided in Israel and New York, and was a stock trader for **WEINBAUM**.

26.     Coconspirator 2 was a citizen of Costa Rica who resided in Costa Rica, and was the office manager of Red Sea Management Ltd.

27.     Coconspirator 3 was a citizen of the United Kingdom who was a nominee owner on behalf of Red Sea Management Ltd. and Sentry Global Securities Limited.

28.     Coconspirator 4 was a citizen of Canada who resided in Costa Rica and was a stock

trader for Sentry Global Securities Limited.

### Relevant Entities

29.     Red Sea Management Ltd. ("Red Sea") was an entity located in San Jose, Costa Rica, that specialized in offshore company incorporation, offshore asset protection, and offshore investments.

30.     Sentry Global Securities Limited ("Sentry Global") was an entity that was co-located with Red Sea in San Jose, Costa Rica, that specialized in trading micro-cap securities.

31.     CO2 Tech Ltd. ("CO2 Tech") was created through a reverse merger with a Nevada shell company. CO2 Tech was publicly traded on the Pink Sheets under the ticker symbol "CTTD." CO2 Tech was purportedly located in London, United Kingdom and provided solutions to mitigate global warming by reducing emissions of carbon dioxide and other pollutants.

32.     Kinross Investments LLC ("Kinross") was a Delaware shell corporation used by Red Sea and Sentry Global to establish brokerage accounts. The nominee who purportedly controlled the company was actually a computer specialist at Red Sea and Sentry Global. Kinross listed, as its business address, an address for a mail forwarding service located in the Southern District of Florida.

33.     Market Maven Management LLC ("Market Maven-DE") was a Delaware corporation used by Red Sea and Sentry Global to establish bank and brokerage accounts. Francis was the original nominee who purportedly controlled the company. Francis was replaced as the nominee director by Coconspirator 3. Market Maven-DE listed, as its business address, an address for a mail forwarding service located in the Southern District of Florida.

34.     Market Maven Management LLC ("Market Maven-Nevis") was an island of Nevis corporation used by Red Sea and Sentry Global to establish an account at American International

7

Depository and Trust. Coconspirator 3 was the original nominee who purportedly controlled the company. Market Maven-Nevis listed, as its business address, an address for a mail forwarding service located in the Southern District of Florida.

35.    American International Depository and Trust changed its name to American Intercapital Depository and Trust ("AIDT"). AIDT was a Colorado institution in which individuals, who were not citizens of the United States, and their business entities could deposit assets. AIDT purported to offer financial anonymity by using minimal identifiers for transactions and by keeping account holder information confidential.

36.    CLX & Associates, Inc. ("CLX") was a stock promotion company controlled by **WEIDENBAUM.** CLX was incorporated in Florida and maintained its place of business in the Southern District of Florida.

37.    JB Investment Enterprises Ltd. ("JB Investments") was a Delaware shell company incorporated by **KROME.** JB Investments was purportedly controlled by a nominee owner, was used to obtain free trading shares of $CO_2$ Tech, and was used to open nominee bank and brokerage accounts.

38.    "VG" was a brokerage firm, headquartered in New York, through which shares of $CO_2$ Tech were traded.

39.    "SS" Corporation was a brokerage firm, headquartered in New Jersey, through which shares of $CO_2$ Tech were traded.

40.    "BW" was a stock promotion company doing business in Florida and Texas.

41.    "T & C" was a stock promotion company located in California.

8

42.     "SMA" was a stock promotion company located in Miami, in the Southern District of Florida.

43.     "WSCF" was a stock promotion company located in Miami, in the Southern District of Florida.

44.     Bank-1 was a bank with numerous locations, including a branch located in Vancouver, British Columbia, Canada.

## COUNT 1
### Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud
### (18 U.S.C. § 371)

1.     Paragraphs 1 through 44 of the General Allegations section of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2.     From in or around 2003 through in or around 2008, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**JONATHAN RANDALL CURSHEN,**
**MICHAEL SIMON KROME,**
**RONNY SALAZAR MORALES, a/k/a "Ronny Salazar,"**
**ROBERT LLOYD WEIDENBAUM,**
**ERIC ARIAV WEINBAUM,**
**IZHACK ZIGDON, a/k/a "Ytzhak Zigdon,"**
**TIMOTHY BROWN BARHAM, JR.,**
**NATHAN BRADLEY MONTGOMERY,**
**and**
**RYAN MARK REYNOLDS,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly, combine, conspire, confederate and agree with each other and others, known and unknown to the Grand Jury, to commit certain offenses against the United States, namely:

9

a.    securities fraud, that is, to willfully and knowingly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, and did (a) employ a device, scheme and artifice to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon others, in connection with the purchase and sale of said securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5;

b.    wire fraud, that is, to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343;

c.    mail fraud, that is, to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and for the purpose of executing such scheme and artifice, to knowingly cause to be delivered certain mail matter by the United States Postal Service and by private and

commercial interstate carrier, according to the directions thereon, in violation of Title 18, United States Code, Section 1341.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy that **WEINBAUM, ZIGDON, KROME, CURSHEN, SALAZAR, WEIDENBAUM, REYNOLDS, MONTGOMERY, BARHAM,** and their coconspirators would: (a) have free trading shares of CO2 Tech stock issued; (b) engage in the fraudulent manipulation of the stock of CO2 Tech by artificially inflating the market price and demand for CO2 Tech stock; (c) divert the proceeds of the fraud for the personal use and benefit of the defendants and others; and (d) conceal the defendants and their coconspirators' involvement in the fraudulent manipulation of the stock of CO2 Tech.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their coconspirators would and did seek to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.      **CURSHEN** would and did take ownership and control of Red Sea and Sentry Global in Costa Rica.

5.      **CURSHEN** would and did recruit **SALAZAR**, Coconspirator 4 and Francis to act as stock traders at Sentry Global.

6.      **CURSHEN** would and did hire a mail service where letters and packages could be sent to a Miami street address, located in the Southern District of Florida, and then forwarded to Red Sea and Sentry Global in Costa Rica.

7.      **CURSHEN** would and did recruit **WEINBAUM** to execute the market manipulation of CO2 Tech stock through Red Sea and Sentry Global.

11

8.    **CURSHEN, SALAZAR**, Coconspirator 4, Francis and their coconspirators would and did establish accounts at brokerage firms in New York and New Jersey using the mail service in Miami as the mailing address for the accounts, and would later use the accounts to facilitate the trading of CO2 Tech stock.

9.    **CURSHEN, SALAZAR**, Coconspirator 4, Francis and their coconspirators at Red Sea and Sentry Global would and did cause the creation of a nominee brokerage account for **WEINBAUM** and **ZIGDON** to conceal the identities of the true beneficial owners of the account.

10.    **WEINBAUM, ZIGDON, KROME** and their coconspirators would and did use a nominee company and accounts in the name of JB Investments for the purpose of facilitating the issuance of free trading shares of CO2 Tech stock, and to conceal the true owners of JB Investments and the shares of CO2 Tech stock.

11.    **KROME** would and did create materially false and misleading documents, including an opinion letter, in order to facilitate the issuance of, and remove trading restrictions on, shares of CO2 Tech stock.

12.    **WEINBAUM, ZIGDON, WEIDENBAUM,** and their coconspirators would and did cause the issuance and public dissemination of press releases, emails, and facsimiles through the means of interstate commerce and otherwise that contained materially false and misleading information and failed to disclose material information relating to CO2 Tech.

13.    **WEINBAUM, WEIDENBAUM, CURSHEN, SALAZAR, REYNOLDS, MONTGOMERY, BARHAM,** Coconspirator 4, Coconspirator 1, and their coconspirators would and did manipulate the trading volume and share price of CO2 Tech stock by secretly coordinating their trading in the shares of CO2 Tech.

14.    **WEINBAUM** directed the trading of $CO_2$ Tech shares from his home in Boca Raton, in the Southern District of Florida.

15.    **CURSHEN, WEINBAUM, SALAZAR**, Coconspirator 1, and Coconspirator 4 would and did place sell orders for hundreds of thousands of shares of $CO_2$ Tech stock, which **WEIDENBAUM, REYNOLDS, MONTGOMERY, BARHAM** and their coconspirators would and did arrange to be matched with buy orders placed by **WEIDENBAUM, REYNOLDS, MONTGOMERY, BARHAM** and their coconspirators.

16.    **WEINBAUM, CURSHEN, SALAZAR**, Coconspirator 4, Coconspirator 1, and their coconspirators would and did conceal their coordinated trading activities through the use of nominee brokerage accounts established and controlled by **CURSHEN, SALAZAR**, Francis, Coconspirator 4 and their coconspirators.

17.    **WEIDENBAUM, REYNOLDS, MONTGOMERY, BARHAM** and other coconspirators would and did engage in coordinated trades by purchasing shares of $CO_2$ Tech on the open market from **WEINBAUM, SALAZAR, CURSHEN,** Coconspirator 4, Coconspirator 1 and their coconspirators at artificially inflated prices in order to create the appearance of legitimate buying interest by legitimate investors, when in fact these coordinated buys were being concealed from the investing public.

18.    **WEINBAUM, CURSHEN, SALAZAR, REYNOLDS, MONTGOMERY, BARHAM,** Coconspirator 4 and Coconspirator 1 would and did sell shares of $CO_2$ Tech to unsuspecting victim investors at the artificially inflated prices they had created.

19.    **CURSHEN, WEINBAUM, ZIGDON, SALAZAR,** Francis and their co-conspirators would cause and did cause the movement of the funds generated through the $CO_2$

Tech scheme through domestic and overseas nominee accounts in order to conceal the origin, destination and ownership of the ill-gotten funds.

20.     **WEINBAUM** and **ZIGDON** would and did cause the payment of cash to **WEIDENBAUM, REYNOLDS, MONTGOMERY, BARHAM** and their coconspirators for their participation in the CO2 Tech scheme.

21.     When the NASD requested documents relating to CO2 Tech, **KROME** would and did provide false and misleading materials in an attempt to cover-up the stock manipulation scheme.

22.     When testifying before the SEC, **KROME** would and did provide false testimony in an attempt to conceal the identities of his coconspirators, including **WEINBAUM** and **ZIGDON**.

### Overt Acts

In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the coconspirators committed and caused to be committed, in the Southern District of Florida and elsewhere, at least one of the following overt acts, among others:

1.     In or around 2003, **CURSHEN** caused the rental of a mailbox in Miami, in the Southern District of Florida, to serve as a mailing address for numerous shell companies, including Market Maven-DE, Market Maven-Nevis, and Kinross.

2.     In or around May 2006, **CURSHEN, SALAZAR**, Francis and their coconspirators caused the opening of an account at AIDT in the name of Market Maven-Nevis (account number xxxxxx1169), falsely identifying the owner of the account as Coconspirator 3.

3.     In or about August 2006, **CURSHEN** would cause Francis to establish a bank account in the name of Sentry Global at Bank-1 in Vancouver, British Columbia, Canada (account number xxxxx3070) under the false pretenses that the account was for the use of Francis, that it

would be used by Francis for the deposit of personal trading proceeds, and affirming that the bank account would not be used on behalf of any third party.

4.     On or about September 25, 2006, **SALAZAR** sent an email to an employee at AIDT confirming that Market Maven-Nevis was 100% owned and controlled by Coconspirator 3, a citizen of the UK, knowing that the account was in fact owned, controlled, funded and used exclusively by **CURSHEN, SALAZAR**, Coconspirator 4, Francis and their coconspirators.

5.     In or around October 2006, **WEINBAUM** traveled to Costa Rica to meet with **CURSHEN, SALAZAR**, and their coconspirators, and to examine the operations of Red Sea and Sentry Global.

6.     On or about November 7, 2006, **CURSHEN** sent an email to Coconspirator 2 indicating that **WEINBAUM** and **ZIGDON** had begun the process of bringing business to Red Sea and Sentry Global, and indicating that **ZIGDON** would be providing the documentation necessary to open accounts for **WEINBAUM** and **ZIGDON**.

7.     On or about December 18, 2006, **KROME** sought the assistance of others in locating a shell company that could be purchased with funds provided by **WEINBAUM** and **ZIGDON**.

8.     On or about December 20, 2006, **CURSHEN** caused **SALAZAR**, Coconspirator 4, and Francis to establish a brokerage account at the VG, in the name of Market Maven-DE, using a mail forwarding service in Miami, in the Southern District of Florida, as the mailing address on the account.

9.     On or about December 20, 2006, **CURSHEN** caused **SALAZAR**, Coconspirator 4, Francis, and their coconspirators to establish a brokerage account at SS Corporation in the name

of Kinross, using a mail forwarding service in Miami, in the Southern District of Florida, as the mailing address on the account.

10.     On or about December 21, 2006, **KROME** caused a wire transfer from his Bank of America account (account number xxxxxxxx5719) of approximately $175,000 for the purpose of purchasing a Nevada shell company that would eventually be renamed CO2 Tech.

11.     On or about December 26, 2006, **KROME** furnished information to Standard & Poor's CUSIP Service Bureau requesting a new CUSIP number for the shell company that was later renamed CO2 Tech, and identified himself as the company's counsel.

12.     On or about January 2, 2007, **KROME** filed information with the Secretary of State for Nevada, changing the name of the shell company to CO2 Tech.

13.     On or about January 3, 2007, **KROME** caused the creation of JB Investments in Delaware.

14.     In or around early January 2007, **MONTGOMERY** and his co-conspirator traveled to Costa Rica to meet with **CURSHEN**, Coconspirator 4, and their co-conspirators, and to examine the operations of Red Sea and Sentry Global.

15.     On or about January 14, 2007, **WEINBAUM, CURSHEN** and Coconspirator 1 met in Vancouver, British Columbia, to discuss the selling of CO2 Tech stock through Red Sea and Sentry Global.

16.   ‾ On or about January 16, 2007, **KROME** wrote an opinion letter that caused the issuance of approximately 22.5 million shares of CO2 Tech stock, free of any restrictive legend.

17.     On or about January 26, 2007, **WEIDENBAUM** caused an interstate wire transfer of approximately $50,000 from CLX's bank account (account number xxxxxx2532) in Miami,

16

located in the Southern District of Florida, to T & C's bank account (account number xxxxx9776) in California for the purpose of promoting CO2 Tech stock.

18.     On or about January 29, 2007, **CURSHEN, WEINBAUM, SALAZAR,** Coconspirator 1, and Coconspirator 4 sold 458,000 shares of CO2 Tech stock at a per share price of $.937 resulting in proceeds in the amount of $424,842.82.

19.     On or about January 30, 2007, **ZIGDON,** and his coconspirators caused the dissemination of a press release falsely stating that CO2 Tech "will join Boeing's global commitment to support anti-global warming activities and other environmental efforts," that "Boeing's interest has been captured by CO2 Tech's new solution to reduce polluting gases emitted from airplanes at high altitudes," and that "CO2 Tech will proceed in the development of its innovative solution . . . so that Boeing may be the first aircraft manufacturer to implement the new anti-global warming system and successfully reduce air pollution from high-altitude emissions," when, in fact, CO2 Tech never had any relationship with Boeing.

20.     On or about January 30, 2007, **CURSHEN, WEINBAUM, SALAZAR,** Coconspirator 1, and Coconspirator 4 sold 2,778,404 shares of CO2 Tech stock at a per share price of $1.044616 resulting in proceeds in the amount of $2,873,276.16.

21.     On or about January 30, 2007, **REYNOLDS** caused the purchase of approximately 100,000 shares of CTTD  through a trading account in the name of Bellatalia Enterprises at a cost of approximately $0.94 per share.

22.     On or about January 31, 2007, **ZIGDON** and his coconspirators caused the dissemination of press releases stating that CO2 Tech was "very pleased with Boeing's

17

encouragement of our work on this innovative product" when, in fact, CO2 Tech never had any relationship with Boeing.

23.     On or about January 31, 2007, **CURSHEN, WEINBAUM, SALAZAR**, Coconspirator 1, and Coconspirator 4 sold 45,000 shares of CO2 Tech stock at a per share price of $1.68333 resulting in proceeds in the amount of $74,990.52.

24.     On or about January 31, 20007, **BARHAM** caused the purchase of approximately 100,000 shares of CTTD  at a cost of approximately $1.655 per share.

25.     On or about January 31, 2007, **MONTGOMERY** caused the purchase of approximately 100,000 shares of CTTD through a trading account in the name of Minnesota Venture Capital at a total cost of approximately $1.763 per share.

26.     On or about January 31, 2007, **WEIDENBAUM** caused the interstate wire transfer of approximately $32,000 from CLX's bank account (account number xxxxxx2532) in Miami, located in the Southern District of Florida, to SMA's bank account (account number xxxxxxxx1683) in New York in order to promote CO2 Tech stock.

27.     On or about January 31, 2007, **WEIDENBAUM** caused the interstate wire transfer of approximately $40,000 from CLX's bank account (account number xxxxxx2532) in Miami, located in the Southern District of Florida, to WSCF's bank account (account number xxxxxxxx3543) in New York in order to promote CO2 Tech stock.

28.     On or about February 4, 2007, **WEINBAUM, ZIGDON**, and **KROME** provided false and misleading information to an accounting firm for the purpose of having the accounting firm prepare CO2 Tech's financial statements, which were subsequently posted on the Pink Sheets website.

29.     On or about February 5, 2007, **WEINBAUM, ZIGDON**, and **KROME** caused the transmission of a facsimile via interstate wire transmission from an accounting firm in Utah to **WEINBAUM'S** home in Boca Raton, located in the Southern District of Florida.

30.     On or about February 5, 2007, **WEINBAUM, WEIDENBAUM** and their coconspirators caused the dissemination of a facsimile stating that "TIME IS TICKING! Stand With Boeing," and "If Boeing likes CTTD, so will you," when, in fact, Boeing never had any relationship with CO2 Tech.

31.     On or about February 6, 2007, **WEINBAUM, ZIGDON, CURSHEN, SALAZAR**, Francis, and their co-conspirators caused a foreign wire transfer of approximately $1,999,992.81 from the Market Maven account at AIDT in Colorado (account xxxxxx1169) to the Vancouver, British Columbia, Canada, Bank-1 account (account number xxxxx3070) in the name of Sentry Global.

32.     On or about February 6, 2007, Francis provided false testimony about his knowledge of Red Sea and Sentry Global to the NASD.

33.     On or about February 7, 2007, **WEINBAUM, ZIGDON, CURSHEN, SALAZAR**, Francis, and their co-conspirators caused a foreign wire  transfer of approximately $505,147.99, constituting proceeds of the market manipulation of CO2 Tech stock, from the Bank-1 account (account number xxxxx3070) in Vancouver, British Columbia, Canada, to a corporate account in Switzerland.

34.     On  or about February 7, 2007, **WEINBAUM** and **ZIGDON** caused Coconspirator 1 to collect approximately $1 million in United States currency from numerous persons in and around New York City.

19

35.     On or about February 8, 2007, **WEINBAUM** caused Coconspirator 1 to travel on a private jet chartered by **WEIDENBAUM** from New Jersey to Opa Locka airport in the Southern District of Florida, to deliver approximately $1 million in United States currency to **WEIDENBAUM** for **WEIDENBAUM**'s and his coconspirators' roles in the scheme.

36.     On or about February 8, 2007, **WEIDENBAUM** met with **REYNOLDS, MONTGOMERY, BARHAM** and their coconspirators on Key Biscayne, located in the Southern District of Florida, for the purpose of paying **REYNOLDS, MONTGOMERY, BARHAM** and their coconspirators US currency in return for their role in the CO2 Tech scheme.

37.     On or about February 12, 2007, **WEIDENBAUM** caused the interstate transfer of approximately $62,000 from CLX's bank account in Miami, in the Southern District of Florida, to BW's bank account (account number xxxxxxxx6192) in New York to promote CO2 Tech stock.

38.     On or about February 13, 2007, **CURSHEN** and **SALAZAR** caused a brokerage statement for Market Maven Management LLC's brokerage account at VG to be mailed to Market Maven-DE in Miami, Florida.

39.     On or about February 23, 2007, **WEIDENBAUM** and **WEINBAUM** caused CLX and Associates to send by express mail a check in the amount of $22,137.62 to an aviation company.

40.     On or about February 26, 2007, **WEIDENBAUM** caused the interstate wire transfer of approximately $250,000 from CLX's bank account (account number xxxxxx2532) in Miami, located in the Southern District of Florida, to **BARHAM's** bank account at Chester County Bank located in Henderson, Tennessee (account number xxx8473).

20

41.     On or about March 16, 2007, **CURSHEN** and **SALAZAR** caused a brokerage statement for Market Maven Management LLC's brokerage account at VG to be mailed to Market Maven-DE in Miami, Florida.

42.     On or about February 15, 2008, **KROME** provided false and misleading testimony to the SEC regarding the true ownership and control of CO2 Tech.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### Securities Registration Violation
### (15 U.S.C. § 77e(a))

1.     In or around January 2007, in the Southern District of Florida, and elsewhere, the defendant,

## MICHAEL SIMON KROME,

where no registration statement was  in effect as to a security, willfully carried and cause to be carried, directly and indirectly, through the mails and in interstate commerce, by any means and instruments of transportation, any such security for the purpose of sale and for delivery after sale, in violation of Title 15, United States Code, Sections 77e(a)(2) and 77x.

2.     No valid registration statement was filed with the SEC and in effect with respect to the sales of, and offers to sell, shares of stock in CO2 Tech.

In violation of Title 15, United States Code, Sections 77e(a)(2) and 77x, and Title 18, United States Code, Section 2.

21

## COUNTS 3 – 5
### Wire Fraud
### (18 U.S.C. § 1343)

1.      Paragraphs 1 through 14, paragraphs 17 through 20, and paragraphs 26<u>9</u> through 4<s>0</s><u>4</u>

of the General Allegations section of this Superseding Indictment are re-alleged and incorporated

by reference as if fully set forth herein.

2.      On or about the dates set forth as to each count below, in Miami-Dade County, in

the Southern District of Florida, and elsewhere, the defendants,

**MICHAEL SIMON KROME,**
**ROBERT LLOYD WEIDENBAUM,**
**ERIC ARIAV WEINBAUM,**
**and**
**IZHACK ZIGDON, a/k/a "Ytzhak Zigdon,"**

did knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to

defraud and to obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises, and for the purpose of executing such scheme and artifice, did

knowingly transmit and cause to be transmitted by means of wire communications in interstate and

foreign commerce any writings, signs, signals, pictures and sounds, in violation of Title 18, United

States Code, Section 1343.

### Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme and artifice for the defendants and their accomplices

to unlawfully enrich themselves by, among other things: (a) having free trading shares of CO2 Tech

stock issued; (b) engaging in the fraudulent manipulation of the stock of CO2 Tech by artificially

inflating the market price and demand for CO2 Tech stock; (c)  diverting the proceeds of the fraud

22

for the personal use and benefit of the defendants and others; and (d) concealing the defendants and others involvement in the fraudulent manipulation of the stock of CO2 Tech.

**The Scheme and Artifice**

The manner and means by which the defendants and their accomplices sought to accomplish the purpose of the scheme and artifice included, among others, the following:

4.     **WEINBAUM, ZIGDON,** and others would establish a nominee brokerage account at Red Sea and Sentry Global to conceal their identities as the true beneficial owners of the account.

5.     **WEINBAUM, ZIGDON, KROME,** and others would and did use a nominee company and accounts in the name of JB Investments for the purpose of facilitating the issuance of free trading shares of CO2 Tech stock, and to conceal the true owners of JB Investments and the shares of CO2 Tech stock.

6.     **KROME** would and did create materially false and misleading documents, including an opinion letter, in order to facilitate the issuance of, and remove trading restrictions on, shares of CO2 Tech stock.

7.     **WEINBAUM, ZIGDON, WEIDENBAUM,** and others would and did cause the issuance and public dissemination of press releases and emails through the means of interstate commerce and otherwise that contained materially false and misleading information and failed to disclose material information relating CO2 Tech.

8.     **WEINBAUM, WEIDENBAUM,** and others would and did manipulate the trading volume and share price of CO2 Tech stock by secretly coordinating their trading in the shares of CO2 Tech.

23

9.      **WEINBAUM** directed the trading of CO2 Tech shares from his home in Boca Raton, in the Southern District of Florida.

10.     **WEINBAUM** and others would and did place sell orders for hundreds of thousands of shares of CO2 Tech stock, which **WEIDENBAUM** and others would and did arrange to be matched with buy orders placed by **WEIDENBAUM** and others.

11.     **WEINBAUM** and others would and did conceal their coordinated trading activities through the use of nominee brokerage accounts.

12.     **WEIDENBAUM** and others would and did engage in coordinated trades by purchasing shares of CO2 Tech on the open market from **WEINBAUM** and others at artificially inflated prices in order to create the appearance of legitimate buying interest by legitimate investors, when in fact these coordinated buys were being concealed from the investing public.

13.     **WEINBAUM** and others would and did sell shares of CO2 Tech to unsuspecting victim investors at the artificially inflated prices they had created.

14.     **WEINBAUM** and **ZIGDON** would and did cause the payment of cash to **WEIDENBAUM** and others for their participation in the CO2 Tech scheme.

15.     When the NASD requested documents relating to CO2 Tech, **KROME** would and did provide false and misleading materials in an attempt to cover-up the stock manipulation scheme.

16.     When testifying before the SEC, **KROME** would and did provide false testimony in an attempt to conceal the identities of **WEINBAUM** and **ZIGDON**.

### Acts in Execution or Attempted Execution of the Scheme and Artifice

17.     On or about the dates set forth as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants, as set forth below, did knowingly

and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain

money and property by means of materially false and fraudulent pretenses, representations, and

promises, and for the purpose of executing such scheme and artifice, did knowingly transmit and

cause to be transmitted by means of wire communications in interstate and foreign commerce any

writings, signs, signals, pictures and sounds, including:

| COUNT | DEFENDANTS | APPROXIMATE DATE | FROM/ TO | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|---|
| 3 | WEIDENBAUM, WEINBAUM and ZIGDON | 01/31/2007 | Miami, FL to New York, NY | Transfer of approximately $32,000 from CLX's bank account to SMA's bank account in order to promote CO2 Tech's stock. |
| 4 | KROME, WEINBAUM, and ZIGDON | 02/05/2007 | Cedar City, UT to Boca Raton, FL | Facsimile of CO2 Tech's false financial statements for posting on Pink Sheets. |
| 5 | WEINBAUM, ZIGDON, and WEIDENBAUM | 02/12/2007 | Miami, FL to Carrollton, TX | Transfer of approximately $62,000 from CLX's bank account to BW's bank account in order to promote CO2 Tech's stock. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 6 – 8
### Mail Fraud
### (18 U.S.C. § 1341)

1.      Paragraphs 1 through 19, paragraphs 29 through 36, and  paragraphs 38 through 44 of the General Allegations section of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2.      On or about the dates set forth below, at Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**JONATHAN RANDALL CURSHEN,**
**RONNY SALAZAR MORALES, a/k/a "Ronny Salazar,"**
**ROBERT LLOYD WEIDENBAUM, and**
**ERIC ARIAV WEINBAUM,**

did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, and for attempting to do so, did knowingly cause to be delivered by United States mail and private and commercial interstate carrier, according to the directions thereon, certain mail matters and things, in violation of Title 18, United States Code, Section 1341.

## Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme and artifice for the defendants and their accomplices to unlawfully enrich themselves by, among other things: (a) having free trading shares of CO2 Tech stock issued; (b) engaging in the fraudulent manipulation of the stock of CO2 Tech by artificially inflating the market price and demand for CO2 Tech stock; (c)  diverting the proceeds of the fraud for the personal use and benefit of the defendants and others; and (d) concealing the defendants and others involvement in the fraudulent manipulation of the stock of CO2 Tech.

26

## The Scheme and Artifice

The manner and means by which the defendants and their accomplices sought to accomplish the purpose of the scheme and artifice included, among others, the following:

4.      **CURSHEN** would and did take ownership and control of Red Sea and Sentry Global in Costa Rica.

5.      **CURSHEN** would and did recruit **SALAZAR** and others to act as stock traders at Sentry Global.

6.      **CURSHEN** would and did hire a mail service where letters and packages could be sent to a Miami street address, located in the Southern District of Florida, and then forwarded to Red Sea and Sentry Global in Costa Rica.

7.      **CURSHEN** would and did recruit **WEINBAUM** to execute the market manipulation of CO2 Tech stock through Red Sea and Sentry Global.

8.      **CURSHEN, SALAZAR**, and others would and did establish accounts at brokerage firms in New York and New Jersey using the mail service in Miami as the mailing address for the accounts, and would later use the accounts to facilitate the trading of CO2 Tech stock.

9.      **CURSHEN, SALAZAR**, and others would and did cause the creation of a nominee brokerage account for **WEINBAUM** and others to conceal the identities of the true beneficial owners of the account.

10.      **WEINBAUM** and others would and did use a nominee company and accounts in the name of JB Investments for the purpose of facilitating the issuance of free trading shares of CO2 Tech stock, and to conceal the true owners of JB Investments and the shares of CO2 Tech stock.

27

11.  **WEINBAUM, WEIDENBAUM,** and others would and did cause the issuance and public dissemination of press releases, emails, and facsimiles through the means of interstate commerce and otherwise that contained materially false and misleading information and failed to disclose material information relating $CO_2$ Tech.

12.  **WEINBAUM, WEIDENBAUM, CURSHEN, SALAZAR,** and others would and did manipulate the trading volume and share price of $CO_2$ Tech stock by secretly coordinating their trading in the shares of $CO_2$ Tech.

13.  **WEINBAUM** directed the trading of $CO_2$ Tech shares from his home in Boca Raton, in the Southern District of Florida.

14.  **CURSHEN, WEINBAUM, SALAZAR,** and others would and did place sell orders for hundreds of thousands of shares of $CO_2$ Tech stock, which **WEIDENBAUM,** and his coconspirators would and did arrange to be matched with buy orders placed by **WEIDENBAUM,** and his coconspirators.

15.  **WEINBAUM, CURSHEN, SALAZAR,** and others would and did conceal their coordinated trading activities through the use of nominee brokerage accounts established and controlled by **CURSHEN, SALAZAR,** and others.

16.  **WEIDENBAUM,** and other coconspirators would and did engage in coordinated trades by purchasing shares of $CO_2$ Tech on the open market from **WEINBAUM, SALAZAR, CURSHEN** and others at artificially inflated prices in order to create the appearance of legitimate buying interest by legitimate investors, when in fact these coordinated buys were being concealed from the investing public.

17.     **WEINBAUM, CURSHEN, SALAZAR**, and others would and did sell shares of CO2 Tech to unsuspecting victim investors at the artificially inflated prices they had created.

18.     **WEINBAUM** and others would and did cause the payment of cash to **WEIDENBAUM** and their coconspirators for their participation in the CO2 Tech scheme.

### Acts in Execution or Attempted Execution of the Scheme and Artifice

19.     On or about the dates set forth as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants, as set forth below, did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, and for attempting to do so, did knowingly cause to be delivered by United States mail and private and commercial interstate carrier, according to the directions thereon, certain mail matters and things, as set forth in each count below:

| COUNT | DEFENDANTS | APPROXIMATE DATE | MAILING |
|---|---|---|---|
| 6 | **CURSHEN and SALAZAR** | 02/13/2007 | Brokerage statement sent by U. S. Mail from VG via Penson Financial Services to Market Maven-DE in Miami, FL. |
| 7 | **WEINBAUM and WEIDENBAUM** | 02/23/2007 | Federal Express Package, Tracking No. 790678664362, sent from CLX in Miami, FL, to an aviation company, containing a check for approximately $22,137.62. |

| COUNT | DEFENDANTS | APPROXIMATE DATE | MAILING |
|-------|-----------|------------------|---------|
| 8 | **CURSHEN** and **SALAZAR** | 03/16/2007 | Brokerage statement sent by U. S. Mail from VG via Penson Financial Services to Market Maven-DE in Miami, FL |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT 9
### Obstruction of Justice
### (18 U.S.C. § 1512(c)(2))

On February 18, 2008, in Miami-Dade County, the Southern District of Florida, and elsewhere, the defendant,

### MICHAEL SIMON KROME,

did corruptly obstruct, influence, and impede an official proceeding, and attempt to do so, that is in a testimonial proceeding before the Securities and Exchange Commission, a Federal Government agency, which is authorized by law, investigating federal securities law violations in connection with the sale and purchase of the stock of CO2 Tech, the defendant provided false and misleading testimony to conceal **WEINBAUM**'s identity, and **WEINBAUM**'s and **ZIGDON**'s involvement in CO2 Tech.  In violation of Title 18, United States Code, Section 1512(c)(2).

## COUNT 10
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

1.      From in or around 2003 through in or around 2008, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

### JONATHAN RANDALL CURSHEN and
### RONNY SALAZAR MORALES, a/k/a "Ronny Salazar,"

did wilfully, that is, with the intent to further the object of the conspiracy, and knowingly, combine, conspire, confederate and agree with each other and others, known and unknown to the Grand Jury, to commit certain offenses under Title 18, United States Code, Section 1956, that is, to knowingly transport, transmit, and transfer, and to attempt to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

2.      It is further alleged that the specified unlawful activity is mail fraud, wire fraud and securities fraud, punishable under the laws of the United States.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their coconspirators sought to accomplish the objects of the conspiracy included, among others, the following:

3.      **CURSHEN** would and did take ownership and control of Red Sea and Sentry Global in Costa Rica.

4.      **CURSHEN** would and did hire a mail service where letters and packages could be sent to a Miami street address, located in the Southern District of Florida, and then be forwarded to Red Sea and Sentry Global in Costa Rica.

3.     **CURSHEN** would and did take ownership and control of Red Sea and Sentry Global in Costa Rica.

4.     **CURSHEN** would and did hire a mail service where letters and packages could be sent to a Miami street address, located in the Southern District of Florida, and then be forwarded to Red Sea and Sentry Global in Costa Rica.

5.     **CURSHEN** would and did recruit **SALAZAR**, Coconspirator 4 and Francis to act as stock traders at Sentry Global.

6.     **CURSHEN** would and did cause Francis to establish accounts at AIDT in the United States under false pretenses in order to hide the true ownership, control and purpose of the accounts. American International Depository and Trust changed its name to American Intercapital Depository and Trust ("AIDT"). AIDT was a Colorado institution in which individuals, who were not citizens of the United States, and their business entities could deposit assets. AIDT purported to offer financial anonymity by using minimal identifiers for transactions and by keeping account holder information confidential

7.     **CURSHEN** would and did cause Francis to establish accounts at Bank-1 in Vancouver, Canada, under false pretenses in order to hide the true ownership, control and purpose of the accounts. Bank-1 was a bank with numerous locations, including a branch located in Vancouver, British Columbia, Canada.

8.     **CURSHEN** would and did solicit and recruit stock traders and promoters to open stock trading accounts with Sentry Global.

9.     **CURSHEN** would and did solicit and recruit stock traders and promoters to trade securities through Sentry Global in an effort to mask the true ownership and control of the accounts and shares being traded.

10.     **CURSHEN, SALAZAR**, Coconspirator 4, Francis and their co-conspirators would and did cause funds generated through stock manipulation schemes to be transferred from, to and through domestic and overseas nominee accounts, including at AIDT and Bank-1, in order to conceal the origin, destination and ownership of the ill-gotten funds.

All in violation of Title 18, United States Code, Section 1956(h).

33

## FORFEITURE ALLEGATION
### (18 U.S.C. §§ 981 and 982)

1.      The allegations contained in Counts One and Three through Eight of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants have an interest.

2.      Upon conviction of Counts One and Three through Eight of this Superseding Indictment, defendants shall forfeit to the United States, any property, real or personal, which constitutes or is derived from proceeds traceable to any such violation, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

3.      Upon conviction of the offense charged in Count Ten of this Superseding Indictment, the defendants shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

4.      The property subject to forfeiture includes but is not limited to the following: $7,000,000.00 in United States currency.

5.      If any of the property described above, as a result of any act or omission of the defendants:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without

34

difficulty, the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(a)(1), and the procedures outlined at Title 21, United States Code, Section 853.

A TRUE BILL

FOREPERSON

WIFREDO A. FERRER
UNITED STATES ATTORNEY

DENIS J. McINEREY, CHIEF
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

N. NATHAN DIMOCK
RINA C. TUCKER HARRIS
TRIAL ATTORNEYS
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

35

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. _____11-20131-CR-MARTINEZ(s) |
| vs. | |
| JONATHAN RANDALL CURSHEN, et al. | **CERTIFICATE OF TRIAL ATTORNEY*** |
| **Defendants.** | |
| _____/ | **Superseding Case Information:** |

**Court Division:** (Select One)

| | | | |
|---|---|---|---|
| _X_ Miami | ____ Key West | New Defendant(s) | Yes _X_ No ____ |
| ____ FTL | ____ WPB | ____ FTP | Number of New Defendants _3_ |
| | | | Total number of counts _10_ |

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:   (Yes or No)   _No_
     List language and/or dialect   _____

4.   This case will take   _15_   days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

     (Check only one)                                    (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | _____ |
| II | 6 to 10 days | _____ | Minor | |
| III | 11 to 20 days | _X_ | Misdem. | |
| IV | 21 to 60 days | _____ | Felony | _X_ |
| V | 61 days and over | _____ | | |

6.   Has this case been previously filed in this District Court? (Yes or No)   _No_
     If yes:
     Judge: _____   Case No. _____
     (Attach copy of dispositive order)
     Has a complaint been filed in this matter?   (Yes or No)   _Yes_
     If yes:
     Magistrate Case No.   _09-2149-FGT, 09-3275-FGT, 09-3276-FGT_
     Related Miscellaneous numbers: _____
     Defendant(s) in federal custody as of _____
     Defendant(s) in state custody as of _____
     Rule 20 from the _____   District of _____

Is this a potential death penalty case? (Yes or No)   _No_

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?   _____ Yes   _X_ No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?   _____ Yes   _X_ No

N. NATHAN DIMOCK
DOJ TRIAL ATTORNEY
Court No. A5501195

*Penalty Sheet(s) attached

REV 4/8/08

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   Jonathan Randall Curshen     **Case No:**   11-20131-CR-Martinez(s)

Count #:   1

18 U.S.C. § 371

Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud

**\*Max Penalty:**      5 years' imprisonment

Counts #:   6, 8

18 U.S.C. § 1341

Mail Fraud

**\*Max Penalty:**      20 years' imprisonment

Count #:   10

18 U.S.C. § 1956(h)

Conspiracy to Commit Money Laundering

**\*Max Penalty:**      20 years' imprisonment

Count #:

**\*Max Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**   Michael Simon Krome        **Case No:**  11-20131-CR-Martinez(s)

Count #:   1

18 U.S.C. § 371

Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud

**\*Max Penalty:**    5 years' imprisonment

Count #:   2

15 U.S.C. § 77e(a)

Securities Registration Violation

**\*Max Penalty:**    5 years' imprisonment

Count #:   4

18 U.S.C. § 1343

Wire Fraud

**\*Max Penalty:**    20 years' imprisonment

Count #:   9

18 U.S.C. § 1512(c)(2)

Obstruction of Justice

**\*Max Penalty:**    20 years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**   Ronny Salazar Morales, a/k/a "Ronny Salazar"

**Case No:**                        11-20131-CR-Martinez(s)

Count #:   1

18 U.S.C. § 371

Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud

**\*Max Penalty**:   5 years' imprisonment

Counts #:   6, 8

18 U.S.C. § 1341

Mail Fraud

**\*Max Penalty**:   20 years' imprisonment

Count #:   10

18 U.S.C. § 1956(h)

Conspiracy to Commit Money Laundering

**\*Max Penalty:**   20 years' imprisonment

Count #:

**\*Max Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**  Robert Lloyd Weidenbaum    **Case No:**  11-20131-CR-Martinez(s)

Count #:   1

18 U.S.C. § 371

Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud

**\*Max Penalty**:    5 years' imprisonment

Counts #:   3, 5

18 U.S.C. § 1343

Wire Fraud

**\*Max Penalty**:    20 years' imprisonment

Count #:   7

18 U.S.C. § 1341

Mail Fraud

**\*Max Penalty**:    20 years' imprisonment

Count #:

**\*Max Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:**   Eric Ariav Weinbaum        **Case No:**  11-20131-CR-Martinez(s)

Count #:   1

18 U.S.C. § 371

Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud

**\*Max Penalty**:   5 years' imprisonment

Counts #:    3, 4, 5

18 U.S.C. § 1343

Wire Fraud

**\*Max Penalty**:    20 years' imprisonment

Count #:   7

18 U.S.C. § 1341

Mail Fraud

**\*Max Penalty**:    20 years' imprisonment

Count #:

**\*Max Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** Izhack Zigdon, a/k/a "Ytzhak Zigdon"
**Case No:**                11-20131-CR-Martinez(s)

Count #:   1

                        18 U.S.C. § 371

                        Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud

**\*Max Penalty:**      5 years' imprisonment

Counts #:     3, 4, 5

                        18 U.S.C. § 1343

                        Wire Fraud

**\*Max Penalty:**      20 years' imprisonment

Count #:

_____

_____

**\*Max Penalty:**  _____

Count #:

_____

_____

**\*Max Penalty:** _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**  Timothy Brown Barham, Jr.   **Case No:**  11-20131-CR-Martinez(s)

Count #:   1

18 U.S.C. § 371

Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud

**\*Max Penalty**:   5 years' imprisonment

Count #:

**\*Max Penalty**:

Count #:

**\*Max Penalty**:

Count #:

**\*Max Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:**   <u>Nathan Bradley Montgomery</u>   **Case No:**  <u>11-20131-CR-Martinez(s)</u>

Count #:   1

<u>18 U.S.C. § 371</u>

<u>Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud</u>

**<u>*Max Penalty</u>:**   <u>5 years' imprisonment</u>

Count #:

**<u>*Max Penalty</u>:**

Count #:

**<u>*Max Penalty</u>:**

Count #:

**<u>*Max Penalty:</u>**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**   Ryan Mark Reynolds          **Case No:**   11-20131-CR-Martinez(s)

Count #:   1

18 U.S.C. § 371

Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud

**\*Max Penalty**:   5 years' imprisonment

Count #:

**\*Max Penalty**:

Count #:

**\*Max Penalty**:

Count #:

**\*Max Penalty**:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**